MINNIE TRENT *v.* STATE COMPENSATION COMMISSIONER

(No. 7445)

Submitted January 11, 1933.    Decided January 24, 1933.

*H. W. Dushkoff*, for appellant.

*H. B. Lee*, Attorney General, and *R. Dennis Steed*, Assistant Attorney General, for respondent.

KENNA, JUDGE:

Will Trent was killed May 12, 1931, in the course of his employment for Douglas Coal Company, and Minnie Trent claimed compensation as his dependent widow. Her claim was denied by the compensation commissioner, a hearing was had and the same result arrived at, the commissioner stating that she "is not the dependent widow within the meaning of the compensation law", and Minnie Trent appeals from that finding.

The case turns upon the sufficiency of the proof of marriage. The other elements of claimant's right to an award do not seem to be controverted.

There can be no question but that claimant has clearly proven matrimonial habit and repute since the time of her alleged ceremonial marriage to Will Trent. Under the authority of *Suter, Guardian,* v. *Suter,* 68 W. Va. 690, 70 S. E. 705; *Miller* v. *Miller,* 76 W. Va. 352, 85 S. E. 542; and *In the Matter of Meade's Estate,* 82 W. Va. 650, 97 S. E. 127, such proof, *without more,* raises a strong presumption in favor of a valid marriage. This, however, is not the state of this record. By the proof of matrimonial habit and repute, a presumption of valid marriage is raised and the presumption thus raised carries with it a presumed ceremonial marriage requiring the issuance of a regular marriage license. *In the Matter of Meade's Estate, supra,* p. 655; *Beverlin* v. *Beverlin,* 29 W. Va. 732, 3 S. E. 36. This claimant, however, has attempted to prove a ceremonial marriage on June 13, 1918, in Mercer County, West Virginia, at Princeton. She has filed with the papers what purports to be a marriage certificate showing marriage on that date and signed by Reverend S. N.

Gibson, and witnessed by O. O. Karnes, a justice of the peace. She has testified that Will Trent and she went to the county clerk's office at Princeton, West Virginia, prior to their marriage, and that there Will Trent asked for a marriage license, paid three dollars and received a rolled-up paper supposed by her to be the marriage license. After receiving it, they went to the office of O. O. Karnes and there, in his presence and in the presence of two other witnesses, the names of whom she did not at the time know, and does not now know, they were married by S. N. Gibson who wrote out the marriage certificate upon which O. O. Karnes also wrote and which was then handed to the claimant by Gibson with instructions that she keep it. At another point in the proof, Minnie Trent testifies that she married Will Trent immediately after the death of Walter Cox, a cousin of Will Trent. The date of Cox's death is fixed by other proof as April, 1921. At still another place, she testifies that they were married after the war; and, again, that they were married about four months after the Armistice. Lowery Bowling, clerk of the county court of Mercer County, West Virginia, in an ex parte affidavit, states: ''I have examined *our marriage records* and do not find any record of a license issued to William Trent and Minnie Southerland at any time during the year 1918; that our records do not show that O. O. Karnes was a justice of the peace during the year 1918, and further certify that our records indicate that S. N. Gibson executed a bond to celebrate the rights of matrimony in this state, in this county, on November 5, 1918, and that no record has been made in this county of such license other than the filing with the marriage license returns for the month of June, 1918, of a copy of a marriage certificate dated June 13, 1918, signed by Reverend S. N. Gibson, Princeton, West Virginia, and witnessed by O. O. Karnes, J. P.'' (This filing took place on August 6, 1931). Mrs. W. H. Dushkoff testifies that she went to the county clerk's office and asked the clerk to ''let me see the original records of the applications for marriage licenses or of returns made for the years *1919*, *1920* and *1921*. At first he said that the records in the bound books would show it, but the young lady in the office said sometimes there are slip-ups and they do not get them all on the record; so I looked in

the original returns for the ministers, but was unable to find one covering this marriage. I then asked to see the original applications for the licenses. They stated that in moving, the originals were placed in the basement and that he couldn't get to them readily. I made two trips over there to look at these records, but the clerk was not able to get them all for me, because he said they were stored away and he was unable to get to them without considerable difficulty; although section 63, chapter 14 of the Code of West Virginia states that the clerk of the county court shall make a complete record in a bound book of all matters required to be ascertained by him in that section and it may be that somewhere in these original papers is a record of this marriage.'' In addition to the foregoing proof concerning the issuance and existence of a marriage license, there is testimony tending strongly to throw doubt upon the authenticity of the marriage certificate.

It will be observed that Mrs. Dushkoff asked to see ''the original records of the applications for marriage licenses or returns made for the years *1919*, *1920* and *1921*'', thus not covering the year 1918, when the alleged ceremony may have taken place, and, perhaps, not examining the record required by statute to be kept by the clerk; also that the examination of the clerk of ''our marriage records'', not specifically describing them, was confined to the year 1918 whereas it is claimed that the ceremony may have taken place in either 1919 or 1921.

It will be seen from the foregoing that the question of the issuance of a marriage license and also the question of the performance of a ceremonial marriage are both very much beclouded by the state of the proof.

It is settled law in West Virginia that where the presumption raised from proof of matrimonial habit and repute is attacked and ''it is shown that no license was ever issued authorizing the marriage of the parties in any of the counties in which they have lived, and such reputed widow fails to testify upon the question of her marriage, although offered an opportunity to do so, the presumption arising from such marital habit or reputation is sufficiently rebutted to warrant the county court's refusal to appoint such reputed widow, or one named by her, to administer upon such estate.'' In the

Matter of Meade's Estate, 82 W. Va. 650, 97 S. E. 127, Syl. Pt. 4. It is true that in the case at bar, the widow did testify and presumably threw all the light of which she was capable upon the question of her marriage. But her testimony is of a very unsatisfactory nature, indicating a ceremonial marriage which could have taken place in June, 1918, in March, 1919, in April, 1921, or sometime after the war within the dates named. The testimony of the county clerk himself is not satisfactory. He states that he has examined "our marriage records" for the year 1918. We presume that the clerk kept the record of marriages prescribed by law to be kept in his office. There is proof from which it may be inferred that a record in the nature of a blotter was kept in the county clerk's office, and that the information for the issuance of marriage licenses was noted first upon this record and that afterward this information was transferred to a well-bound book kept in the clerk's office as the permanent record. Section 14 of chapter 63 of the Code of 1923, provides, in part, as follows: "The clerk of the county court, *at the time of issuing* the license, shall make a complete record, in a well-bound book, of all matters in this section required to be ascertained by him." The matters referred to are in the same section enumerated as follows: "The full names of both parties, their respective ages and their places of birth and residence." It will be observed further that the record required by the statute is to be made up by the clerk before delivering the marriage license. Was this the record examined by the clerk and from which his affidavit was made? If it was and if he examined it for the year 1918, why then did he not examine it for the months of the year 1919 that the ceremonial marriage from the testimony of Minnie Trent might have taken place, and for the year 1921? Counsel for claimant testifies that upon her request to be permitted to have access to the original memorandum of applications for license, she was told that such records for the years 1918, 1919 and 1920 had been stored away and were not accessible.

The value of proof showing the absence of a record in order to prove its non-existence is based upon the presumption that the law has been complied with and that the official in question has done his full duty in the manner prescribed by

law. If the duty had been fully performed, then, of course, the record would exist, and proof of the non-existence of the record of a marriage license in the county where the alleged ceremonial marriage took place would raise the presumption that no such license issued. Such presumption, however, is rebuttable.

Since the proof before the compensation commissioner is not in such form as will enable this court satisfactorily to follow the effect of shifting burdens of proof; since it no where appears in this record just exactly what records in the office of the clerk of the county court of Mercer County have been examined; since the periods examined do not exhaust the dates assigned for the alleged ceremony; since the minister who allegedly performed the ceremony has made only an ex parte statement in which he makes contradictory statements, and since there has been no effort to prove the handwriting of O. O. Karnes, justice of the peace, whose purported signature as witness is upon the alleged marriage certificate, we do not believe that the compensation commissioner was justified in the state of the record and proof before him, and without further investigation and development of the case, in finding that claimant's marriage to the deceased was not valid.

We therefore reverse the finding and remand the cause for further development along the lines herein indicated.

*Reversed and remanded.*